RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0017p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

CHRISTINE M. LADD,

  *Plaintiff-Appellant,*

  *v.*

GRAND TRUNK WESTERN RAILROAD,
INCORPORATED,

  *Defendant-Appellee.*

No. 07-2512

————————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-73046—Paul D. Borman, District Judge.

Argued: October 30, 2008

Decided and Filed: January 14, 2009

Before: KENNEDY, SUTTON, and McKEAGUE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Teresa J. Gorman, Bingham Farms, Michigan, for Appellant. Andrew J. Voss, LITTLER MENDELSON, Minneapolis, Minnesota, for Appellee. **ON BRIEF:** Teresa J. Gorman, Bingham Farms, Michigan, for Appellant. Andrew J. Voss, LITTLER MENDELSON, Minneapolis, Minnesota, for Appellee.

————————————

## OPINION

————————————

KENNEDY, Circuit Judge. Plaintiff Christine Ladd, an African-American woman claiming sex- and race-based harassment and retaliatory discharge against her former employer Grand Trunk Western Railroad ("Grand Trunk"), appeals the district court's grant of summary judgment in favor of Grand Trunk. Ladd argues that she presented a genuine issue as to all of her claims. For the reasons that follow, we AFFIRM the judgment of the district court.

## I.  BACKGROUND

Christine Ladd, an African-American woman, began her employment in the rail track department of Grand Trunk Western Railroad in April of 2000.  Ladd started as a trackman, and was promoted twice, once to welder-helper and then to welder. She was the only African-American woman among her co-workers, the vast majority of whom were Caucasian males.  Ladd's claims arise from two somewhat distinct series of events.  Her claim for sex- and race-based harassment arises out of interactions with co-workers primarily in the fall of 2004.  Her claim for retaliatory discharge arises out of one specific incident on March 21, 2005, where she claimed to be injured by a co-worker's actions, reported that injury, and was subsequently fired for filing a false report.  The termination took place on April 21, 2005. In February of 2005, Ladd had complained internally about that same co-worker's sex- and race-based remark, and in April, Ladd also filed two claims with the Equal Employment Opportunity Commission ("EEOC").  In the first, filed on April 12, Ladd complained of the same co-worker harassment.  In the second, filed on April 27 following her discharge, she claimed that her earlier harassment complaints were the true reasons for her termination.

Jason Richert, the employee whose actions she alleges caused her injuries, is also the only individual she identified in her deposition as having made a specific race- or sex-based offensive remark.  Although Ladd was a welder and a welder-helper who worked underneath a foreman and Richert was a foreman at the same job site, Richert was not Ladd's foreman and therefore she was not one of his subordinates.

A.     Hostile Work Environment

Ladd's hostile work environment claim is based on derogatory race- and sex-based comments by her co-workers which occurred from the beginning of her time at Grand Trunk until the end of 2004, and on tampering with her equipment that occurred in the summer and fall of 2004.  Ladd, in her deposition, averred that she was generally subjected to sexually degrading commentary from the time she started working for Grand Trunk.  ("Always being told if you can't do the job, you shouldn't be out here, it's a man's job out here, and stuff like that.  If you can't handle your weight, you shouldn't be out here, you're taking a man's job.").  She said that the men also talked "about sex, how they treat [] women, [and] how they talk to [] women."  Joy Good, the only other female in the rail track department, in an

affidavit, asserted that she and Ladd "were subjected to unwelcome sexual comments on a daily basis." Ladd mentioned remarks she heard around the work site, though not directed at her, including "lesbian, gay, [and] dyke."

Ladd testified that she did not complain about any of the aforementioned comments, either because they were not said to her face, or because they did not rise to the level where she felt she needed to complain about it. On October 19, 2004, she complained that Richert referred to her as a "black bitch." Ladd alleges that she was speaking with a co-worker over the radio when in the background she heard Richert tell the co-worker to "tell that black bitch to get to the truck and answer her radio." Ladd called her supervisor, Bill Miller, to register her complaint about Richert's comment. Miller denies that Ladd told him that Richert called her a "black bitch," recalling that she simply said that Richert used offensive language; but Miller testified that he told her he would speak with the employees involved, that he spoke with Bill Jackson, the foreman on duty, and Jackson confirmed that he had told Richert not to use any offensive language. Ladd went on seasonal furlough in November of 2004, and returned to service in March 2005. She did not hear any race or sex-based comments after her complaint of October 19. In February of 2005, Ladd told Tracy Miller, an assistant superintendent, about the same comment. Miller informed Grand Trunk's Human Resource Manager, Harlan Arians, who initiated an internal investigation into the complaint and proceeded to interview Ladd, Richert and others who might have knowledge of her complaint. This investigation had not concluded at the time Ladd was taken out of service on March 21, 2005.

The equipment tampering alleged by Ladd occurred in the summer and again in the fall of 2004. Ladd alleged that on July 8, she found her shears were taken apart, and on July 12, her oxygen tanks were taken. On October 19 and 20, bolts were removed from her grinder which resulted in fluid bursting out onto Joy Good, a potentially dangerous situation. Ladd could not identify the perpetrators of the equipment tampering, but she inferred from the fact that she was the only person whose equipment was tampered with that her co-workers did it because of her race or sex or both. Ladd complained about the tampering in July of 2004 to David Chaney and Bill Miller, two of her supervisors. Although both Chaney and Miller testified that they found no evidence of tampering, they counseled Ladd's co-workers not to tamper with her or anyone else's equipment. Ladd also complained about

the defective grinder in October of 2004.  Miller testified that he repaired the defective grinder on both occasions. Ladd did not recall any further instances of equipment tampering following the October 2004 incident.

B.     Retaliation

Ladd engaged in protected conduct when she complained internally regarding Richert's "black bitch" remark in October 2004 and February 2005.  Ladd returned from furlough on March 7, 2005.

Ladd reported a back injury to her superiors on March 21, 2005. She stated that as she attempted to lift a drill from the bed of a truck, Richert moved the truck, and as a result, Ladd hurt her lower back.  Richert denied the charge.  He stated that he walked around the truck and Ladd was not in the bed of the truck, she was standing on the rear passenger side. He said that he told her that he was going to back up the truck, and then he did.  He did not find out until later that Ladd had reported an injury and accused him of causing it.  Ladd went home to soak her back when she received a phone call from Joseph Maranzano, the track supervisor at the Flint yard where Ladd worked, telling her that she was suspended pending investigation.  Ladd received treatment for her back injury the next day.

The same day as the injury, Maranzano began an investigation into Ladd's injury. He contacted David Cromie, the Risk Manager, and they interviewed Ladd, Richert and other potential witnesses.  Richert and four witnesses stated that they did not see Ladd in the bed of the truck.  Several of the witnesses stated that she was standing on the side of the truck when Richert started it up.  Ladd maintained that she was in the bed of the truck and that no one could have seen her there.  She alleged that the eyewitnesses were lying to protect Richert.  Still on the same day, Maranzano had a conference call with Robert Cerri, the superintendent, and others, who decided both Ladd and Richert would be charged with serious misconduct, either the falsification of an injury report by Ladd or causing personal injury to Ladd by Richert.  Ladd was removed from service immediately but Richert was not, based on the statements of the eyewitnesses.

On April 8, 2005, Grand Trunk held a formal hearing before Larry Wizauer in which Richert was charged with unsafe conduct in starting the truck without ascertaining it was safe

to do so and Ladd was charged with falsifying an injury report. Larry Wizauer was a hearing and investigating officer who had conducted internal investigations for Grand Trunk for approximately 25 years, during which he had conducted in excess of 100 such investigations. Both Richert and Ladd were represented at the hearing by the same Union representative. Ladd, Richert, the four witnesses, and Mark Wilson, the welder Ladd was working for at the time, were all called to testify and Wizauer, Ladd, Richert, and the Union representative were all allowed to question the witnesses. Again, Richert and the four witnesses testified that they did not see Ladd in the bed of the truck, although they contradicted each other on whether Ladd stood at the front of the truck or the rear of the truck, they contradicted each other on whether Richert paused while walking around the truck, and a few of them admitted that they would not have seen Ladd if she had been bending over in the truck bed. Nevertheless, three witnesses said that they saw Ladd on the ground on the passenger side of the truck while Richert moved the truck. Based on the eyewitness testimony and his evaluation of the witnesses' credibility, Wizauer determined that Richert was not guilty and Ladd was guilty, a recommendation that was passed on to Cerri who had ultimate decision-making authority. On April 12, 2005, a few days after the hearing and prior to any rendered decision on the March 21 incident, Ladd filed a sex discrimination charge with the EEOC based on the events that had taken place in the fall of 2004. Cerri made the decision to terminate Ladd on April 21 based on Wizauer's report, and Ladd was terminated on that day. At that time, Cerri testified that he was aware of Ladd's February 2005 complaints but not yet aware that Ladd had filed a charge against Grand Trunk with the EEOC.

On April 27, Ladd filed a second charge with the EEOC alleging that her termination was motivated by race and sex discrimination and was a retaliatory discharge. The EEOC granted Ladd a right-to-sue letter. On September 3, 2005, in view of the eyewitness testimony and Ladd's "contradictory, evasive and specious" testimony, a Public Law Board reviewed Ladd's dismissal[1] and found that there was "substantial and convincing evidence" that Ladd acted dishonestly, and accordingly, Grand Trunk "was on valid

---

[1]Ladd's union appealed the dismissal to a Public Law Board consisting of a union member, a carrier member, and a neutral member and authorized to hear railway employees' grievances under the Railway Labor Act, 35 U.S.C. § 151 *et seq*.

grounds when it assessed discipline."  Ladd filed this action in federal district court which granted summary judgment to Grand Trunk.

## II. ANALYSIS

A.     Hostile Work Environment

Ladd brings her claim for hostile work environment under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*.  To make out a claim, Ladd needs to show: (1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex or race; (4) the harassment created a hostile work environment; and (5) employer liability.  *Williams v. General Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999).  The district court held that Ladd did not offer evidence creating a genuine issue as to prong five, employer liability.  We affirm the judgment of the district court; however, we do so based on prong four, the hostile work environment element of the claim.

The district court relied on *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349 (6th Cir. 1988) for its formulation that employer liability exists in a hostile work environment claim for the actions of co-workers where "the employer knew or should have known of the alleged conduct and failed to take prompt remedial action" such that the "employer tolerated or condoned the situation."  *Id.* at 349. We first describe those hostile actions that make up Ladd's hostile work environment claim before analyzing whether the employer responded adequately to those actions.  In the end, we need not analyze whether the employer responded adequately to the actions at hand because those actions do not rise to the level of a hostile work environment.

*Williams* made clear that we must consider the "totality of the circumstances," and not discrete events in isolation.  187 F.3d at 562.  In *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999), we explained further that "totality of the circumstances" meant that: (1) offensive conduct need not be directed at the plaintiff, *id.* at 660; (2) the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand, *id.* at 661; (3) racial or sexual animus can be inferred from

conduct not overtly racial or sexual in nature when the context suggests it, *id.* at 662; and (4) blue collar work environments do not have more leeway when it comes to offensive conduct, *id.* Therefore, Ladd's claim is made up of the allegations that she heard words "lesbian," "dyke," and "gay" thrown around generally by co-workers, other general sexual remarks, and comments that she could not and should not be working because she is a woman, as well as the allegations that co-workers tampered with her equipment, and that Richert referred to her as a "black bitch." We reject Grand Trunk's arguments that the equipment tampering should not be considered part of her claim because she did not know who perpetrated the alleged tampering or if they did it with racial or sexual animus. Similarly, those remarks heard second-hand and also those remarks not directed at Ladd still are considered in assessing the hostility of the work environment.

Taken together, however, those actions still do not rise to the level of an actionable hostile work environment. The Court in *Harris v. Forklift Sys.*, 510 U.S. 17 (1993) held that we must look at "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 23. In the instant case, no actual touching took place. *See*, *e.g.*, *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004) (holding that one incident of touching was not sufficiently frequent, severe, physically threatening, or humiliating to constitute a hostile work environment even though coupled with sexually suggestive comments). While "the conduct underlying a sexual harassment claim need not be overtly sexual in nature" to rise to the necessary level, *Williams*, 187 F.3d at 656, Ladd in her deposition only testified that one specific incident of the use of a sex- or race-based epithet was directed at her over the entire span of her employment.**[2]** Indeed, in drawing inferences

---

**[2]** In Ladd's brief on appeal, citing to Joy Good's affidavit in which Good states that she had heard Richert refer to Ladd as "a nigger and a lazy nigger," Ladd asserted that she learned second hand from Good of epithets Richert used to refer to her. But nothing in Good's affidavit indicates that Ladd was present when Richert referred to her in that way, nor does Ladd or Good state when, how, or if at all Ladd received that information from Good. On the other hand, Ladd's deposition testimony indicates that the "black bitch" slur was the only derogatory remark that she was aware that Richert had made. Even taking the inferences in Ladd's favor for the purposes of summary judgment, we cannot conclude that Ladd learned second hand from Good that Richert had referred to her using a racial epithet before her termination. However, even if Ladd had learned of this remark prior to her termination, her claim would still be insufficient to create a hostile work environment.

in her favor for the purposes of summary judgment, we are limited by her total lack of specificity as to verbal abuse she received apart from the aforementioned remarks. She has alleged that she was subject to derogatory sex-based comments on a daily basis, but without specifics it is difficult to adjudge their severity. Ladd herself said that they did not rise to the level that she needed to complain about them.[3] None of the derogatory comments came from Ladd's supervisors. *Cf. Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). That other slurs--"lesbian," "dyke," and "gay"--were not directed at her diminishes their severity. *See*, *e.g.*, *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) ("sex-based comments need not be directed at a plaintiff to constitute conduct violating Title VII . . . [but] this fact contributes to our conclusion that the conduct here was not severe enough").

The earlier incidents were not repeated after she complained and the employer cautioned employees about interfering with her equipment. The only potentially physically threatening situation of equipment tampering was that the removal of the bolts from her grinder could cause dangerous fluid to burst out. However, Ladd has failed to present sufficient evidence to permit us to conclude that loosening the bolts on the grinder so that fluid spewed out presented a physically threatening work environment according to *Harris*. Without verbal abuse and physical threats rising to the necessary level, even when taken together, what we are left with is not actionable. Finding no genuine issue of material fact, we affirm the district court's grant of summary judgment to Grand Trunk on Ladd's hostile work environment claim.

B.    Retaliation

Ladd also brings her claim for retaliation under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*. To maintain a claim for retaliation, Ladd must establish that: (1) she engaged in Title VII-protected activity; (2) Grand Trunk knew that she engaged

---

[3]We bring this up to understand the objective severity of the comments Ladd had to put up with on a daily basis, not to discard the comments as not subjectively abusive as Grand Trunk argues. *Cf. Harris*, 510 U.S. at 21-22 ("if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment"). Ladd stated that it was not that the comments did not bother her, it was that she just had to "shake it off" to get through work in an environment dominated by Caucasian men.

in the protected activity; (3) Grand Trunk subsequently took an adverse employment action against Ladd; and (4) the adverse action was causally related to the protected activity. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)). After Ladd sets out her prima facie case, the burden of production shifts to Grand Trunk to offer a non-discriminatory reason for the adverse employment action. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). If Grand Trunk meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was mere pretext. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The burden of persuasion remains with Ladd throughout, even while the burden of production shifts between the parties. *Id.* (citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)).

We need not address whether Ladd made out her prima facie case, because she has failed to produce any evidence that Grand Trunk's decision was mere pretext and has therefore failed to carry her ultimate burden of persuasion on the issue of retaliation such that a reasonable juror could find in her favor.[4] Grand Trunk's non-discriminatory reason for terminating Ladd is that she filed a false injury report. Ladd must produce evidence that either the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

With respect to prong one, Ladd argues that she did not give a false injury report. The evidence suggests otherwise. The investigation, consisting of multiple interviews and a formal hearing where four witnesses in addition to Richert testified to not seeing Ladd in the bed of the truck and only Ladd testified to being in the truck, clearly provided a basis in fact for the adverse employment action. A Public Law Board that

---

[4]The district court wrote that "[t]he Sixth Circuit has held temporal proximity between an adverse employment action and an employee's protected [sic] standing alone is insufficient to establish a causal connection for retaliation claim." In light of *Mickey*, which was decided after the district court issued its opinion, however, that assessment is suspect. *See* 516 F.3d at 523. We need not address temporal proximity here because even assuming that the facts inferentially evidence a causal nexus between Ladd's protected activity and her eventual discharge, Ladd has failed to show pretext.

reviewed the investigation "found no improprieties and deem[ed] [that] the claimant was afforded a fair and impartial investigation." Even if all of Ladd's white co-workers did lie on Richert's behalf, Grand Trunk is not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008). Cerri based his decision to terminate Ladd on the aforementioned investigations and hearings, which proved to be sufficiently thorough.

In attempting to show pretext pursuant to prongs two and three, Ladd argues that she had a clean discipline record apart from a minor issue with absenteeism and that Richert was found guilty of other rule violations but was not terminated. Her first argument fails because falsifying an injury report is a serious rule violation and Ladd could not show that Richert also had committed a serious rule violation. The Public Law Board found that Ladd's discipline of dismissal was "on valid grounds." Ladd's comparisons to Richert are inapposite where Richert previously violated different rules relating to safety, for which he was reprimanded. In *Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264 (2007), we held that two employees' circumstances were not "sufficiently similar to raise an inference of pretext" even though both employees had broken rules regarding employee honesty. *Id.* at 272-73. On the other hand, we explained further that the plaintiff in *Klepsky*'s dishonesty was more severe because it "went to the very root of his employability and his qualification to drive trucks" since he had failed to report a history of seizures. *Id.* at 272. Here, both lying about the cause of injuries and safety violations go to the root of employability. However, we look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's "motivation and intent" to determine whether the employer was "motivated by retaliation." *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). Even though as outsiders, we may regard safety violations as severe as dishonesty, it is within the company's business judgment to treat differently-situated parties differently. Without similarly situated parties, we cannot adjudge the intent of the employer as to retaliation. Accordingly , we find no error in the district court's summary judgment ruling on Ladd's retaliation.

Therefore, we AFFIRM the judgment of the district court in granting summary judgment to Grand Trunk on Ladd's hostile work environment and retaliation claims.