**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0987n.06

**No. 11-3185**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Sep 07, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROSA RODRIGUEZ-MONGUIO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | **ON APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT FOR THE** |
| OHIO STATE UNIVERSITY, | ) | **SOUTHERN DISTRICT OF OHIO** |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: WHITE, STRANCH, and FARRIS[*], Circuit Judges.**

**HELENE N. WHITE**, Circuit Judge. Dr. Rosa Rodriguez-Monguio (Rodriguez) appeals

the magistrate judge's order granting her former employer, Defendant Ohio State University (OSU),

summary judgment dismissing her Title VII national-origin discrimination and retaliation claims.

We AFFIRM.

**I**

Dr. Rodriguez was born and educated in Spain, where she earned a B.S. in economics in

1994, and a Ph.D. in economics from the University of Barcelona (summa cum laude) in 2001. She

was a technical advisor at the World Health Organization in Washington, D.C., from October 2001

---

[*]Judge Jerome Farris, Circuit Judge for the United States Court of Appeals for the Ninth
Circuit, sitting by designation.

to October 2003, and a consultant for The World Bank in Washington, D.C., from October 2001 to March 2003.

In 2004, Rodriguez applied to teach courses without pay at OSU's College of Public Health (CPH). OSU appointed her to an unsalaried visiting scholar position—adjunct Assistant Professor in CPH's Health Services Management and Policy Division (HSMP). In May 2005, OSU appointed Rodriguez to a two-year term as a research-associate member of the Center for Health Outcomes, Policy, and Evaluation Studies (HOPES). Throughout her employment at OSU, Rodriguez was in a relationship with Dr. Enrique Seoane-Vasquez (Seoane), whom OSU had hired in 2002 as an Assistant Professor in the College of Pharmacy (COP). The two worked together extensively from 2005 to 2007.

In December 2005, Rodriguez accepted a one-year part-time salaried appointment as a Clinical Assistant Professor (CAP) with the CPH HSMP for calendar year 2006. Her salary came from HSMP and HOPES funds. OSU's letter offering Rodriguez the position stated:

> This appointment will be at the rank of Clinical Assistant Professor and is effective from January 1, 2006 through December 31, 2006. Your appointment is contingent upon satisfactory performance and the availability of funds. This appointment carries no presumption of academic tenure or reappointment beyond the period stated.

In May 2006, Dr. Allard Dembe became the new Chair of HSMP and Director of HOPES. Seoane, with whom Rodriguez lived, had filed an internal complaint with OSU in August 2005 and a discrimination charge with the EEOC. He then filed a charge with the Ohio Civil Rights Commission in September 2006.

On October 1, 2006, Dembe notified Rodriguez that her one-year paid CPH appointment would not be renewed and that her unpaid adjunct HSMP Clinical Assistant Professor position was renewed from October 1, 2006 through September 30, 2007.

In the interim, in September 2006, HSMP had posted a tenure-track faculty position. By mid-November 2006 HSMP faculty had narrowed the applicant pool to three, including Eric Seiber, to whom OSU later offered the position. After interviews had been set for the top three candidates, Rodriguez applied for the position on December 13, 2006. Dembe circulated Rodriguez's application to HSMP faculty members, solicited their opinions, and in January 2007, the faculty members met and unanimously agreed that Seiber and another person were the top two candidates. Dembe notified Rodriguez by letter dated January 18, 2007 that she was not selected as a finalist for the tenure-track position.

Several weeks earlier, by email dated December 18, 2006, Dembe advised Rodriguez that although her paid one-year HOPES appointment was not being renewed, she would still have a non-salaried auxiliary appointment in HSMP through September 30, 2007, and would receive $8,000 as a lecturer for teaching two courses in the 2007 Spring semester.

By letter to Dembe dated December 21, 2006, Rodriguez summarized discussions she and Dembe had had, and concluded by saying that since Dembe refused to offer any explanation for 1) his decision to not renew her HOPES appointment; 2) his decision that she was no longer eligible to serve as Principal Investigator for the grant proposal she had developed; and 3) his efforts to discourage her from applying for a tenure-track position opening at the CPH HSMP, she had consulted an attorney and would file a complaint with OSU's Human Resources department and state

and federal authorities unless Dembe indicated a willingness to reverse his unexplained and unjustified decisions before January 1, 2007.

Rodriguez filed complaints with OSU's Human Resources department in January 2007 and a charge with the EEOC in March 2007. She left OSU in June 2007 to teach at the University of Massachusetts. Rodriguez filed the instant complaint in federal district court in October 2007, alleging national-origin discrimination, retaliation, and retaliation by association (with Seoane).

OSU moved for summary judgment, arguing that Rodriguez could not demonstrate a prima facie case of national-origin discrimination. As to all of Rodriguez's claims, OSU also argued that she failed to demonstrate that its legitimate nondiscriminatory reasons for its decisions were pretextual. Rodriguez's response argued that she presented both direct and circumstantial evidence of national-origin discrimination, that she established a prima facie case of retaliation and associational retaliation, and that she presented evidence of pretext to support all her claims.

The magistrate judge[1] granted summary judgment in OSU's favor, concluding that Rodriguez's national-origin discrimination claims failed for failure to show pretext and her retaliation claims failed for failure to establish a prima facie case.

**II**

This court reviews de novo the magistrate judge's grant of summary judgment. *Hawkins v. Anheuser Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). The district court must construe the evidence and draw all reasonable inferences therefrom in the nonmoving party's favor. The issue

---

[1]The parties consented to disposition by a magistrate judge. R. 15.

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

> Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may satisfy his burden of establishing such discrimination either by presenting direct evidence of discriminatory actions by the defendant or by showing the existence of circumstantial evidence that creates an inference of discrimination.

> Direct evidence, if believed, requires a conclusion by the fact-finder that unlawful discrimination was at least a "motivating factor" for the employer's actions. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*). . . .

> To establish a claim of discrimination indirectly, i.e., by circumstantial evidence, a plaintiff must demonstrate (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class ... was treated more favorably than he. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [] (1973). . . .

*Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010).

### III - Direct Evidence of National-Origin Discrimination

Rodriguez argues that the magistrate judge erred by dismissing uncontested direct evidence of national-origin discrimination—namely, in that Dr. Dembe made statements containing stigmatizing stereotypes associated with her being of Spanish origin.

Rodriguez testified on deposition that Dembe made several inappropriate remarks to her:

Q: Did anybody ever make any national origin discriminatory remarks to you while you were at the College of Public Health?

A: Well, Dr. Dembe's language was sometimes not appropriate, I would say.

Q: In what way? What would he say that wasn't appropriate?

A: For example, when he refers to my Ph.D, that he emphasized that my Ph.D. was from Barcelona, that I didn't have a Ph.D. in the U.S.

Q: And he said to you that your Ph.D.'s from Barcelona and it's not from the U.S.?

A: Yes. But in a very derogatory way. That could imply that that is a second class university, having a Ph.D. from Barcelona.
. . . .
[Dembe also said] that I don't know how to put together a budget in the U.S.
. . . .
[Dembe also said when she asked him to explain his decisions] [t]hings like, I know you can't understand . . . I know it's difficult for you to understand.

Rodriguez also points to Dembe's deposition testimony regarding a comparison of Rodriguez's teaching experience to others: "the years of Rosa's teaching, I don't know how many of those were in different countries or in—in different, you know, similar to the United States. . . " Finally, Rodriguez cites deposition testimony of Dembe's supervisor, Dean Lemeshow, to the effect that Rodriguez "has no training in the U.S.; her training is in Spain. She would be someone who I think you'd have to really justify because you don't really know about what kind of training she got. So . . . I would say that it would be a bit of a stretch if you wanted to hire her over some people that we know better about the kind of training that they have."

These statements are not direct evidence because, if believed, they do not require the conclusion that unlawful discrimination was at least a motivating factor in OSU's allegedly adverse employment actions. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (direct evidence of discrimination does not require a fact-finder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part, by prejudice against

members of the protected group); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*) (direct evidence of discrimination is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's adverse employment actions).

Rodriguez also asserts that the magistrate judge erred by failing to consider this court's ruling in *Wexler*, 317 F.3d 564, that statements by a decision-maker that contain stigmatizing stereotypes regarding persons in a protected class provide a classic example of a genuine issue of material fact. *Wexler* is distinguishable. There, the employer referred to the plaintiff as a "bearded, grumpy old man," "pops," and "old man," and said *during the meeting in which the plaintiff was demoted* that he was "60 years old" and did not "need the aggravation, stress of management problems." 317 F.3d at 570-71 (emphasis added). In light of these and other statements, this court concluded that the employer's comments revealed an adherence to a stigmatizing belief about older employees and that "[t]he association of these stigmatizing beliefs with an adverse employment decision creates a genuine issue of material fact as to whether the employer was motivated, at least in part, by discriminatory intent based on those stereotypes." *Id.* at 571-72. This court observed that the statements evincing a discriminatory intent "were made by the decisionmaker, indicated a belief that a person's capabilities as a store manager diminish with age, and [five of the statements] were directed at Wexler at the very time he was being demoted." *Id.* at 572. In contrast, in the instant case the challenged statements did not refer to Rodriguez's Spanish origin, and Rodriguez does not argue that they were made in connection with the claimed adverse employment actions. The

statements do not require the conclusion that the adverse employment actions were motivated at least in part by discriminatory intent. *Id.*

Finally, Rodriguez contends that the magistrate judge failed to consider Dr. Dembe's derogatory tone when he referred to Rodriguez's Ph.D. being from a Spanish university. Rodriguez's argument that the speaker's tone can render seemingly benign comments direct evidence of discriminatory animus is misplaced. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006), on which Rodriguez relies, observed the following regarding the defendant-employer plant manager's occasional reference to the plaintiffs (black employees) as "boy":

> The Court of Appeals disagreed [with Petitioners that this was evidence of discriminatory animus], holding that "[w]hile the use of 'boy' when modified by a racial classification like 'black' or 'white' is evidence of discriminatory intent, the use of 'boy' alone is not evidence of discrimination." Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage. Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous.

*Ash*, 546 U.S. at 456. *Ash* did not hold that benign statements may transform into *direct* evidence that discriminatory intent was a motivating factor *in the adverse employment action*, but rather, that use of a term like 'boy' standing alone could be *probative of bias*. *Id.* (emphasis added).

### IV - Circumstantial Evidence of National-Origin Discrimination and Pretext

Rodriguez also challenges the MJ's determination that she presented insufficient evidence to show that OSU's asserted non-discriminatory reasons for its adverse employment actions were pretextual.

**A - Non-renewal of one-year contract and change of title to "lecturer"**

Rodriguez contends that OSU's "changing explanations" for not renewing her contract are evidence of pretext. She notes that Dembe initially claimed he wanted to take the Center for HOPES in a new direction. But once that explanation was undermined in discovery, OSU gave a different explanation—that Rodriguez's appointment was for one year only, was dependent on sufficient funds being available, and its renewal was not guaranteed. Rodriguez argues that she was never told of the funding aspect despite her repeated requests for an explanation of why her contract was not being renewed.

Dr. Hal Arkes, then-Interim Director of HOPES and the person who coordinated Rodriguez's hiring for the one-year term, stated in an affidavit that he advised Rodriguez a number of times that OSU would only be offering her a one-year contract, that it was contingent on funding, and that funds would likely not be available the following year.

Assuming arguendo that OSU's non-renewal of the one-year position constituted an adverse employment action, Arkes' affidavit and *supporting documentation* directly contradict Rodriguez's claim that she was not told that the one-year appointment was fund-contingent. In addition, because the position no longer existed after Rodriguez's one-year term, she cannot establish that she was replaced by someone outside the protected class or that she was treated differently than similarly-situated employees outside the protected class, and she thus failed to present sufficient circumstantial evidence to establish a *prima facie* case of national-origin discrimination as to the non-renewal of

her one-year appointment. *See Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410

(6th Cir. 2008).

## B - Obstructing Rodriguez's efforts to generate funds by not approving principal investigator status

Rodriguez argues that OSU's refusal to approve her as a Principal Investigator (PI) on grant

applications shows that OSU's articulated reason for not renewing her one-year paid appointment

—lack of funds—was pretextual because at the same time that OSU obstructed her efforts to

generate funds by denying her PI status, it prevented her from securing funding. Rodriguez also

argues that OSU's authorization of other non-salaried OSU faculty to serve as PIs on grants while

denying her such authorization was probative of pretext.

The magistrate judge explained the factual backdrop:

> OSU's Failure to Permit Dr. Rodriguez to Submit the Medicaid Proposal. Plaintiff
> maintains that defendant treated her differently than similarly situated, non-protected
> employees by not permitting her to serve as the principal investigator for the Ohio
> Medicaid grant proposal. . . Plaintiff points to defendant's treatment of Dr. Kenneth
> Steinman and Dr. Michelle Shipp [*sic*]. Dr. Steinman was permitted to be principal
> investigator even though his appointment had changed from paid to unpaid. Dr. Ship
> was compensated solely by funding that she received from grants.
>
> Defendant maintains that Dr. Rodriguez was not eligible to act as a principal
> investigator. The general policy of CPH and HSMP is that non-salaried auxiliary
> faculty are not allowed to serve as a principal investigator on grants. Although
> exceptions to that general policy had been made, the individuals who were permitted
> to serve as principal investigator were not similarly situated to plaintiff. Dr.
> Steinman had been a tenure track faculty member until June 2008. Dr. Ship also
> differed from Dr. Rodriguez significantly. From 2004 to 2007, Dr. Ship had the
> position of research assistant professor. Persons holding a position of research
> assistant professor are permitted to serve as principal investigator, and no exception
> to the general rule was required on her behalf. Defendant further argues that Dr.

> Dembe and others attempted to find alternatives that would permit Dr. Rodriguez to pursue the grant proposal with Ohio Medicaid.

> Here, plaintiff has not produced any evidence to demonstrate that defendant's legitimate, non-discriminatory reason for not allowing the grant proposal to go forward was pretextual. Defendant maintains that the general rule prohibiting non-employees from serving as principal investigator prevented Dr. Rodriguez from going forward with the grant proposal. Because the other individuals that were granted an exception to the general rule were not similarly situated, plaintiff has not shown that defendant's stated reason was not the real reason.

R. 81 at 24-25.

Where a plaintiff lacks direct evidence of discrimination, as in the instant case, she must show that the comparables are similarly situated in all *relevant* respects absent other circumstantial or statistical evidence supporting an inference of discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis added); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

Rodriguez challenges only the magistrate judge's determination that she was not similarly situated to Steinman. She does not dispute that when she was denied PI status in 2006, no other non-salaried faculty in CPH were allowed PI status, nor did she counter OSU's evidence that CPH policy was that unpaid faculty would not be given PI status. Rodriguez contends that the relevant comparison is not Dr. Steinman's prior status as a tenured professor, but rather, his non-salaried status in 2008—two years after she was denied PI status—when he was authorized to be a PI.

Even assuming that we must consider actions OSU took two years after Rodriguez was denied PI status, she failed to counter OSU's evidence that when Steinman was permitted PI status while non-salaried in 2008-2009, he was in a different division of CPH and did not report to Dembe.

CPH Dean Lemeshow and Phillis Pirie, Chair of the Division of Health Behavior and Health Promotion, signed a June 9, 2008 letter to Steinman stating that they supported his status to serve as PI on funded grants and contracts. Douglas Kniss, OSU's Senior Associate Vice President for Research, determined whether to approve Chair Pirie's request, not Dembe. Thus, Steinman was not similarly situated in relevant respects and Rodriguez did not establish a prima facie case of national-origin discrimination as to being denied PI status. *See Bobo*, 665 F.3d at 751.

### C - Failure to promote/hire

In a failure to promote or hire case, a plaintiff establishes a *prima facie* case by showing that 1) she is a member of a protected class, 2) she applied for and was qualified for the position, 3) she was considered for and was denied the position, and 4) another individual of similar or inferior qualifications, who is not a member of the protected class, received the position. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 622-23 (6th Cir. 2006).

> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. . . . [I]n the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Id.* at 626-27.

Rodriguez had seven grants totaling over $158,000; Seiber had five, totaling over $117,000. Rodriguez had taught for six years as an assistant professor, five of them in Spain before teaching

in the United States. Seiber had taught for four years, including five years in a tenure-track faculty position at Clemson University. Rodriguez had ten peer-reviewed articles; Seiber nine. Both had Ph.D.s in economics. Thus, Rodriguez did not establish that her qualifications were "so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Bender*, 455 F.3d at 627. Moreover, the hiring decision was made by a committee, and Rodriguez did not present evidence that the seven faculty members who voted were biased or that Dembe influenced them to vote against her. *See, e.g., Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1241 (10th Cir. 2009).

We conclude that Rodriguez's claims of national-origin discrimination were properly dismissed on the ground that she failed to present sufficient evidence of pretext.

## V - **Associational Retaliation**

Rodriguez also challenges the magistrate judge's ruling that she did not establish a prima facie case of associational-retaliation.[2] Title VII prohibits retaliation against someone so closely related or associated with the person exercising his statutory rights that it would discourage or prevent that person from pursuing those rights. *Thompson v. N. Amer. Stainless, L.P.*, __ U.S. ___, 131 S. Ct. 863, 868-70 (2011) (holding that an employee whose employment was terminated after his fiancee, a co-employee, filed a sex-discrimination charge with the EEOC had standing as an "aggrieved person," under a zone-of-interests test, to sue the employer under Title VII's antiretaliation provision).

---

[2]Rodriguez does not argue on appeal that her retaliation claims based on her own protected activity were improperly dismissed.

In *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held that Title VII's antiretaliation provision protects an individual "from retaliation that produces an injury or harm" and that in order to establish an adverse employment action "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 67, 68 (internal quotations and citation omitted).

"A plaintiff in a Title VII . . . action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Where a plaintiff presents only circumstantial evidence of retaliation, the plaintiff has the initial burden to establish a prima facie case by showing 1) participation in a protected activity (in this instance, by Seoane) known to the defendant, 2) a materially adverse employment action taken against the plaintiff that would deter a reasonable employee from making a charge of employment discrimination, and 3) a causal connection between the protected activity and the adverse employment action. *Spengler*, 615 F.3d at 491-92.

### A - Office-eviction claim

Rodriguez failed to establish a prima facie case of retaliation as to OSU's evicting her from her office because she does not claim to have suffered materially adverse harm. *Burlington Northern* requires that a plaintiff "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 57. Even if she presented a

prima facie case, Rodriguez failed to counter OSU's legitimate non-discriminatory reason for asking her to vacate her office—that uncompensated auxiliary CPH faculty are not eligible for offices—thus she failed to demonstrate pretext.

## B - Remaining adverse employment actions

1. *Prima Facie Case*

As to the remaining adverse employment actions Rodriguez alleges, we conclude that Rodriguez established a prima facie case of retaliation through temporal proximity, but failed to present evidence of pretext. The magistrate judge determined that she could not establish the causal connection element of a prima facie associational-retaliation case because OSU offered her the paid position *after* Seoane complained of discrimination in August 2005. We agree with Rodriguez that the issue is not whether there is a causal connection between Seoane's protected activity in 2005 and the non-renewal of her paid appointment in the fall of 2006 and other allegedly adverse actions, but rather, whether there is a causal connection between Dr. Balkrishnan making Dembe aware in the late summer of 2006 of Seoane's protected activity and Dembe's decision soon after not to renew her appointment and the other allegedly adverse actions.

Rodriguez maintains that Dembe initially was supportive of her and Seoane, encouraged them to pursue a grant opportunity with Ohio Medicaid, and offered them technical assistance and other support for that effort. In the fall of 2006, Rodriguez maintains, Dembe's attitude toward her and Seoane dramatically changed after Seoane complained that Balkrishnan, an Associate Professor in the COP, COP Chair Nahata, and COP Dean Brueggemeier were discriminating and retaliating against him (Seoane). OSU investigated Seoane's claims, found that Balkrishnan had engaged in

-15-

inappropriate conduct, and recommended discipline against him. Thereafter, Balkrishnan made disparaging remarks to Dembe about Seoane and Rodriguez. Rodriguez contends that within days of the Dembe-Balkrishnan meeting, Dembe began retaliating against her. Dembe's allegedly retaliatory conduct included not renewing Rodriguez's salaried part-time one-year appointment, barring her from serving as PI on grant applications, and misleading Rodriguez into not applying for an open tenure-track position on the ground that he was not interested in a person with her profile.

We conclude that Rodriguez presented evidence of a causal connection between Seoane's protected conduct and the allegedly adverse actions set forth in the paragraph above through temporal proximity. Dembe testified that sometime in the early autumn of 2006, he met with Balkrishnan at Balkrishnan's request, and that Balkrishnan had a "general griping" session, which Dembe listened to but did not put much stock in. Dembe testified that Balkrishnan told him that several COP faculty members, principally Seoane and Rodriguez, were creating a negative environment and were difficult to work with. Dembe also recalled that Balkrishnan made comments that the husband of another troublesome COP faculty member was paying Seoane's attorney fees and "possibly supporting financially actions against the [COP]." R. 54 at 14. By letter dated October 1, 2006, Dembe informed Rodriguez that her one-year appointment would not be renewed. Rodriguez worked until the one- year-term for that position ended in January 2007. Although the exact date Dembe and Balkrishnan spoke is unknown, it was within weeks of October 1, 2006, thus there was temporal proximity between the alleged adverse employment action and Balkrishnan's allegedly informing Dembe of Seoane's protected activity. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008) ("Where an adverse employment action occurs very close in

time after an employer learns of protected activity, such temporal proximity . . . is significant enough to constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation.").

2. *Pretext*

If a plaintiff establishes a prima facie case and the employer articulates a legitimate non-discriminatory reason for its adverse employment action, the burden shifts to the plaintiff to establish pretext. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). The plaintiff must produce evidence that either the proffered reason (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to warrant the adverse action. *Id.*

Regarding the non-renewal of her one-year appointment, Rodriguez advances the same argument as she did to support her national-origin discrimination claim—that OSU's changing explanations are evidence of pretext. This claim fails for the reasons discussed *supra*.

Regarding OSU's refusal to authorize her to serve as a PI, OSU articulated the legitimate nondiscriminatory reason that she was non-salaried, which was in keeping with CPH and HSMP's general policy that non-salaried auxiliary faculty are not allowed to serve as a PI on grants. As discussed *supra*, Rodriguez failed to counter OSU's evidence that when Steinman, who had been a tenure-track professor, was permitted PI status while non-salaried in 2008-2009, he was in a different division of CPH than Rodriguez, and did not report to Dembe. It was Douglas Kniss, OSU's Senior Associate Vice President for Research, who determined whether to approve Pirie's request that Steinman be permitted to serve as PI.

Thus, we cannot agree with Rodriguez's argument that the fact that OSU treated her less favorably than Steinman "is sufficient evidence of pretext to create an issue of fact for trial." Rodriguez failed to present evidence that OSU's general policy that non-salaried auxiliary faculty are not permitted PI status had no basis in fact, did not motivate the allegedly adverse employment action, or was insufficient to warrant the action. *Ladd*, 552 F.3d at 502.

Rodriguez's claim that OSU chose not to hire her for an open tenure-track position for retaliatory reasons fails as well, because she did not present evidence that a majority of the members of the hiring committee were biased against her as a result of Seoane's protected activity. Nor did Rodriguez present evidence that Dembe or any other committee member exerted influence over the other members to vote against her because of Seoane's protected activity. *See e.g., Couch*, 587 F.3d at 1241.

## VI - Co-Worker Retaliation

Rodriguez contends that the magistrate judge improperly dismissed her co-worker retaliation claim against Balkrishnan based on Seoane's protected activity (as opposed to her own).

After *Burlington Northern*, the Sixth Circuit held that an employer will be liable for co-worker retaliation if:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008) (holding in this sexual-harassment and retaliation case that the employer was not entitled to summary judgment on one plaintiff's retaliation claim where a jury could find 1) that management knew about allegations that a co-employee had set fire to that plaintiff's car in retaliation for her reporting his sexual harassment, and 2) that management acted inappropriately by repeatedly removing the harassed female employees from the line on which she and the alleged harasser worked, while failing to take more fundamental action, such as training, warning, or monitoring him).

Considering Seoane's protected activity, Rodriguez's co-worker retaliation claim fails because she presented insufficient evidence that Balkrishnan's retaliatory conduct was materially adverse, i.e., that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination, *Burlington N.*, 548 U.S. at 68 (observing that Title VII does not set forth a general civility code for the American workplace, and that the antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms); and even if she had, she presented insufficient evidence that OSU condoned, tolerated, or encouraged the acts of retaliation. *Hawkins*, 517 F.3d at 347.

## VII

For these reasons, we AFFIRM the magistrate judge's grant of summary judgment to OSU.